[Cite as *In re S.S.*, 2018-Ohio-1349.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| S.S.-1, | : | |
| S.S.-2, | | |
| and | : | Case No. 17CA44 |
| E.B., | | |
| | : | |
| Adjudicated Dependent | : | <u>DECISION AND JUDGMENT ENTRY</u> |
| Children. | | |
| | : | |

_____

APPEARANCES:

Krista Gieske, Cincinnati, Ohio, for Appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Merry M. Saunders, Athens County Assistant Prosecuting Attorney,, Ohio, for Appellee.

_____

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:3-29-18
ABELE, J.

{¶ 1} This is an appeal from an Athens County Common Pleas Court, Juvenile Division, judgment that granted Athens County Children Services (ACCS), appellee herein, permanent custody of S.S.-1, S.S.-2 and E.B. T.S., the children's biological mother and appellant herein,[1] raises the following assignments of error for review:

FIRST ASSIGNMENT OF ERROR:

---

[1] Appellant and J.B. are the biological parents of E.B. Appellant and M.S. are the parents of S.S.-1 and S.S.-2. Neither J.B. nor M.S. are involved in this appeal. Furthermore, M.S. did not participate during the trial court proceedings.

"THE TRIAL COURT'S DECISION AWARDING PERMANENT CUSTODY OF S.S.-(1), S.S.-(2), AND E.B. TO ATHENS COUNTY CHILDREN SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY OF THE CHILDREN TO ATHENS COUNTY CHILDREN SERVICES WHERE THE RECORD PLAINLY REVEALS THAT PLACEMENT WITH MATERNAL GRANDMOTHER WAS NEVER ACTUALLY CONSIDERED."

{¶ 2} In March 2014, appellee filed neglect and dependency complaints concerning the three children. The complaints alleged that the oldest child, S.S.-1, had been missing school and that appellant has substance abuse issues. Subsequently, the trial court adjudicated the children dependent, dismissed the neglect allegations and granted appellee protective supervision over the children.

{¶ 3} Over the next two years, appellant engaged in some case planning services, but did not successfully conquer her drug addiction. She was also unable to maintain a safe residence for the children. Thus, on May 9, 2016, the trial court placed the children in appellee's temporary custody. Appellee placed the three children with K.B., E.B.'s paternal grandmother.

{¶ 4} Approximately one year later, appellee filed a motion to modify the disposition to permanent custody. Appellee alleged that the children cannot be placed with their parents within a reasonable time or should not be placed with their parents, that S.S.-1 and S.S.-2's father abandoned them, and that the children have been in ACCS's temporary custody for at least twelve of the past twenty-two consecutive months. Appellee further asserted that placing the children in its permanent custody would serve the children's best interest.

{¶ 5} At the permanent custody hearing, Andrea Bobo, the two oldest children's school principal during the 2016-2017 school year, testified that before appellee obtained temporary custody of the children, she attempted to work with appellant on the children's truancy and behavioral issues. Bobo stated that appellant was not consistently responsive and that appellant's "communication was very inconsistent." Bobo explained that sometimes appellant would be "very * * * combative and argumentative" and other times Bobo could not contact appellant.

{¶ 6} Bobo testified that the children's truancy and tardiness issues caused transition difficulties for the children and disrupted their routines. Bobo related that the children benefitted from routine. Bobo stated that even when the children's maternal grandmother was available to assist appellant, the children still had truancy issues, but were "less significant."

{¶ 7} Bobo additionally indicated that the children's "[h]ygiene was a huge concern [and] * * * there certainly were a lot of signs that indicated * * * that there was some neglect occurring." She stated that the children had head lice and that S.S.-1 had a large boil on her leg that "had obviously gone unattended for quite some time and she was having difficulty walking." Bobo further revealed that the children had dental problems, but did not elaborate on the nature of the problems.

{¶ 8} Bobo explained that once the children were removed from appellant's custody and placed with K.B., their overall hygiene improved, they were always clean, they received proper dental care, and they consistently attended school. She additionally stated that K.B. is receptive, attends conferences, is very involved at school, and brings the children to school functions.

{¶ 9} Bobo indicated that S.S.-1's consistent attendance alleviated her transition issues,

and that although S.S.-2 initially showed improvement, his behaviors declined after the holidays when his routine was disrupted. Bobo further stated that S.S.-2's behavior continued to decline toward the end of the school year when J.B. apparently had been staying at K.B.'s house.

{¶ 10} Appellant's drug and alcohol counselor, Jessica Frost, testified that in August 2016, she began to work with appellant. Frost explained that appellant's "treatment plan includes establishing and maintaining sobriety, well-being coping skills, and identifying and working toward goals that will better herself." Frost related that through her discussions with appellant regarding substance abuse, appellant places blame on "her environment [and the] people around her." Frost testified that part of her discussion regarding coping skills involved "eliminating toxic people in [appellant's] life." Frost stated that appellant identified J.B. as a "toxic" person in her life. Frost also revealed that appellant's identified goal is to attend school in the fall of 2017.

{¶ 11} Frost indicated that although appellant had periods of non-attendance, appellant recently had been attending the majority of her weekly individual and group appointments. Frost further explained that during the earlier stages of appellant's treatment, appellant appeared "minimally engaged in treatment" or "minimally compliant" with treatment. Frost additionally stated, however, that appellant continued to test positive for "THC, buprenorphine, and methamphetamine" and that her continued drug use would render appellant "noncompliant."

{¶ 12} Frost further testified that in August 2016, appellant was discharged from the "Medication Assisted Therapy" program because the doctor wanted appellant to obtain "a proof of pregnancy before prescribing her any medication and [appellant] did not follow-up." Frost related that appellant takes Suboxone, even though appellant does not have a prescription for it.

Frost testified that she discussed Vivitrol with appellant and stated that it has "always been an option."  Frost explained that appellant tried to engage in the Vivitrol program, but the program had a ninety-day waiting period before it would accept appellant.  Thus, appellant did not start the Vivitrol program and Frost speculated that appellant "just lost enthusiasm by the time the 90-day period was up."

{¶ 13} When appellee's counsel asked Frost if appellant has made progress maintaining her sobriety, Frost stated that she did not "feel like [she could] answer that."  Frost did indicate, however, that appellant has not made "substantial" progress with her coping skills and has not attained her number one goal to maintain sobriety.

{¶ 14} Frost further revealed that appellant's continued drug use concerns her and that she would like appellant to complete an inpatient treatment program because an inpatient treatment would give appellant "a chance to have a healthy environment.  To work on what she needs for sober living skills."  Frost indicated that she discussed inpatient treatment with appellant "in passing," but she has not yet proposed it as a formal recommendation.  Frost related that appellant did not seem willing to consider inpatient treatment.

{¶ 15} K.B., J.B.'s mother, testified that J.B. and appellant lived in her home after E.B.'s birth.  She explained that appellant left "a couple of different times * * * and stayed at My Sister's Place for a period of time."  K.B. indicated that after appellant left My Sister's Place, appellant returned to K.B.'s home "briefly," and then stayed with appellant's mother.  K.B. stated that after that point, the children alternated between her house and appellant's mother's house.  K.B. related that there was "lots of back and forth."

{¶ 16} K.B. stated that in April 2015, appellant and J.B. obtained an apartment and the

family lived together for approximately one year before appellee obtained temporary custody. K.B. testified that "most of the time," the apartment "was cluttered, dirty, [and] unkept." K.B. explained that she "was always concerned that [the children] weren't being cared for as they should be. They just weren't really taken care of properly."

{¶ 17} K.B. related that the three children have lived in her home since April 2016, when appellee obtained temporary custody. She stated that when the children entered her care, S.S.-1 and S.S.-2 displayed behavioral issues. K.B. explained that S.S.-1 "had a mom [sic] complex * * * where she wants to be very independent," "does not really want to be told what to do," "has a hard time not getting her own way in things," and "likes to be in charge and kind of take charge over the other two kids sometimes." K.B. related that S.S.-2 "has some defiance issues" and "gets angry very quickly when he's told that he can't do something or can't have something that he wants."

{¶ 18} K.B. stated that S.S.-1 and S.S.-2's behaviors have gotten "[a] little bit" better since entering her home. K.B. indicated that both children undergo counseling to try to help with the behavioral issues. K.B. related that she "see[s] bits and pieces of progress." She explained that S.S.-2's "temper tantrums have lessened. He does still have them but they're not as frequent." K.B. stated that S.S.-1 "has let go of that need for control somewhat. It's still there a little bit but she's learning also to relax a little bit more and just be a kid." K.B. believes the structure she has provided the children has helped them progress. K.B. testified that she is willing to keep the children and that she would allow appellant and J.B. to visit the children "as often as possible."

{¶ 19} K.B. recognized that the children still "have a desire to be with their mom," but

she further related that "overall," "they are doing okay." She explained that the children are healthy and "happy most of the time," but "there's a long way to go." K.B. related that S.S.-1 has discussed living with appellant again, and once S.S.-1 mentions it, S.S.-2 "is right on board with her and wants that also."

{¶ 20} K.B. stated that the children seem to enjoy visits with appellant. She explained: "[T]hey don't necessarily want to leave" and have a "higher energy level," because "they've had a good time with her." K.B. additionally related that appellant calls the children "almost daily" and that S.S.-1 and S.S.-2 "look forward to being able to talk to [appellant]."

{¶ 21} Appellant testified that for the past six months, she has lived in a camper located on her mother's property. Before that, she lived at an apartment for approximately two years, but was evicted in March 2017 for nonpayment of rent. Appellant agrees that the apartment condition when she moved out "was pretty bad"; "[i]t was dirty and it had holes in the wall." Appellee's counsel asked appellant whether "there were issues with the cleanliness of the apartment during the entire time that [she] * * * lived at the apartment." Appellant responded, "Technically I guess, yes." Appellant claimed that the apartment "was decently clean" while the children lived in the home, but after their removal, the apartment became "disgusting." Appellant explained that "[t]here was trash everywhere" and she "guess[es]" that "[t]here were also dog feces on the floor."

{¶ 22} Appellant knew that the children had truancy and tardiness issues when in her custody, and sometimes the children were late "because [she] was daily dosing at HRS." Appellant stated that she did not "see how" their tardiness had "an impact on [them] and their success at school." Appellant agreed, however, that the days they missed school could impact

their school performance.

{¶ 23} Appellant testified that she attends HRS every week for group and individual counseling. Appellant claimed that she attempted to get into the Suboxone program at HRS, but was not successful because: "I missed my period for like four months so I thought that I might be pregnant, and ended up just being a cyst on my ovary. I explained that to the doctor at HRS and he done [sic] a pregnancy test and it came back negative. He called me a liar and just didn't see me anymore." Appellant denied Frost's assertion that appellant was supposed to follow up with some doctor appointments and denied that she was offered Vivitrol or that she tried to enter any Vivitrol programs.

{¶ 24} Appellant admitted that some of her drug screens showed the presence of methamphetamine and that her screens "probably" also revealed Suboxone and THC. Appellant indicated that she last used methamphetamine approximately three weeks prior to her testimony, Suboxone the day before, and marijuana a couple of weeks before. Appellant explained that although she continues to use some substances on occasion, she is not dependent on them. Appellant related that "[t]he only times that [she has] used is honestly when [J.B.] was hanging around [her] and he wouldn't stay away from [her]." Appellant stated that she tested positive for methamphetamine in April, May, and August 2017, most likely because J.B. was around. Appellant indicated that she tends to use when J.B. is around and that she does not use when he is not around. Appellant blamed J.B. for her drug use: "I have responsibility on my own use, but I don't have responsibility when he is waving it in my face like that."

{¶ 25} Appellant stated that HRS recommended inpatient treatment "one time," but that she did not follow up. Appellant claimed that in April 2017 a doctor told her to seek inpatient

treatment. Appellant explained that she "looked for rehab houses," but she has "not found one yet." Appellant related that she asked her HRS counselor a few days ago for suggestions. Appellant additionally testified that she is willing and "very able" to go to inpatient treatment.

{¶ 26} Appellant also agreed that her camper is not appropriate for the children, but believes that she is capable of caring for the children. Appellant indicated that her mother assists her with transportation and that she will have her own vehicle once she can afford to fix it. Appellant stated that she does not believe that her substance abuse impacts her ability to care for the children. She also agreed she has had some relapses, but thinks that taking Suboxone helps control her drug addiction. Appellant indicated that she takes Suboxone so she can feel "well everyday." Appellant recognized that she does not have a prescription for Suboxone, but instead, she "buy[s] it from people." Appellant did state that her goal is to become completely clean at some point. Appellant explained that she "plan[s] to get on Vivitrol shot and be taken off of that as well." Appellant indicated that she believes it is important for her to stay clean for her children.

{¶ 27} Appellant further stated that she plans to obtain more appropriate housing once she starts school in August 2017. Appellant explained that her mother spoke with a landlord and "they're suppose[d] to be renting me a three bedroom when I get my first school check."

{¶ 28} Appellant also testified that she does not believe the children should be in appellee's "custody at all." Appellant claimed that the children were up to date on their shots before appellee obtained temporary custody. With respect to the children's dental issues, appellant explained that S.S.-1 had a "gagging" problem. Appellant additionally stated that the children "always had behavior problems" and that she does not believe being late to school

caused their behavioral issues. Appellant related that S.S.-2 "has always acted out" and was in counseling for a few months before appellee received temporary custody. Appellant stated that S.S.-1 had been in counseling for six to eight months before her removal.

{¶ 29} Appellant indicated that if the children cannot live with her, then she would like the children to live with appellant's mother until appellant obtains appropriate housing. Appellant testified that she does not believe it will take her long to obtain appropriate housing. Appellant stated that if appellant's mother "cannot have them [she is] fine with them staying with [K.B.] until [appellant] can get them back." Appellant explained that her mother "technically" has other grandchildren living with her, but appellant believes that two of the children will soon return home to their mother. Appellant stated that the children "have a really good relationship" with K.B. Appellant does not believe that the children should be placed in appellee's permanent custody.

{¶ 30} Appellant also stated that she visits the children weekly and that they ask her "almost every time they see me when they can come home." Appellant related that she is "pretty sure" the children "want to come home."

{¶ 31} ACCS caseworker Hannah Jeffers testified that she has worked with the family since October 2015. At that time, appellee had a protective supervision order and a case plan in place. Jeffers stated that the case plan identified the following concerns: housing, maintenance, truancy, medical appointments, and substance abuse. Jeffers explained that when she visited the family's apartment while the children still were in appellant's care, the apartment had trash, dirty clothes, dog feces, urine, and an "abundance of dishes." Jeffers stated that she advised appellant and J.B. to clean the apartment and provided them with cleaning supplies, bug

spray, toothpaste, toothbrushes, and bed covers. Jeffers indicated that the apartment "sporadically" got better and if she had a scheduled appointment, the apartment would be clean, but if she made an unannounced visit, the apartment would be messy. Jeffers testified that the apartment deteriorated once appellee removed the children.

{¶ 32} Jeffers explained that both appellant and J.B. had substance abuse issues. Jeffers stated that in 2017, she screened appellant for drugs seven times, and appellant tested positive six times. Jeffers revealed that appellant tested positive for amphetamines, methamphetamine, THC, and Suboxone.

{¶ 33} Jeffers indicated that appellant reported that she attends HRS and that she is working on getting into a Vivitrol program. Jeffers testified that she discussed inpatient treatment with appellant, and appellant "asked if that would make anything change." Jeffers responded that she did not "know if it would make a change or not but it definitely would be in the positive and anything to better her own life it would definitely be a suggestion." Jeffers testified that appellant's continued substance abuse raises concerns about appellant's ability to safely care for the children.

{¶ 34} Jeffers stated that appellant attended S.S.-2's IEP meeting in December 2016, but she had "limited participation," and "appear[ed] to be nodding off" during the meeting.

{¶ 35} Jeffers also indicated that appellant attended the majority of her visits with the children and that appellee did not identify any major concerns with appellant's interaction with the children during her visits. Jeffers agreed that the children share a strong relationship with appellant and that they are excited to see their mother. She further testified, however, that "[t]he children had a very hard time when" appellant failed to attend. Jeffers noted that during 2017,

appellant has had only two "no shows." Jeffers clarified that appellee did not decide to seek permanent custody due to a lack of relationship between appellant and the children, but instead, due to appellant's substance abuse and lack of appropriate housing.

{¶ 36} Jeffers related that the children seem content in K.B.'s home and described them as "overall happy children." Jeffers stated that in May 2016 she spoke with the children about their wishes, and they advised her as follows: (1) S.S.-1 stated that she wanted to "live in a hotel or her aunts [sic] home"; (2) S.S.-2 indicated that he wanted to stay at K.B.'s home; and (3) E.B. stated that she "wanted to live in a tree house." Jeffers indicated that she later asked the children how they would feel if they stayed at K.B.'s house "for a longer period of time." She stated that the two older children stated "good," and E.B. "just kind of nodded and smiled." Jeffers revealed that another time, S.S.-1 "stated that she was happy about [living at K.B.'s] because they got to go on vacation," and S.S.-2 stated that he "wanted to live with his mother and squirted [Jeffers] in the face with [a] squirt gun." Jeffers agreed that the children have "at some point" told her that they would like to return home to appellant.

{¶ 37} Jeffers testified that she believes that placing the children in appellee's permanent custody is in their best interest. Jeffers explained that "there's been consistent, ongoing substance abuse issues throughout the years, housing deterioration, no consistency and structure within the home," and a failure to prioritize the children's education. She stated that the children need long-term stability and that appellant cannot currently provide structure or stability due to her lack of appropriate housing and her substance abuse issues. Jeffers noted that appellant has been working on these same issues since 2014.

{¶ 38} Jeffers further related that M.H., appellant's mother, showed interest in kinship

placement, but appellee denied a prior home study concerning three of her other grandchildren. Jeffers further noted, however, that even though appellee denied the prior home study, the court nevertheless placed the three other grandchildren in her care.

{¶ 39} The children's guardian ad litem, Tara Huffman, testified that she believes that placement in appellee's permanent custody is in the children's best interest. Huffman explained that appellant's substance abuse and housing have been ongoing concerns for the past three years and appellant has failed to completely resolve those issues. Huffman stated that she does not believe that the children can safely return to appellant's care. Huffman indicated that she also spoke with the children about their wishes, but Huffman did not believe that they understood the import of permanent custody. Huffman did not elaborate upon what the children expressed as their wishes.

{¶ 40} M.H., the children's maternal grandmother, testified that she is willing to care for the children. Although she currently has three other grandchildren who live with her, she expects the children's mother soon will regain custody of the two older children. M.H. stated that the other grandchildren's mother is a recovering heroin addict who spent two years in prison, but is now studying to be an addiction counselor.

{¶ 41} M.H. does not believe children services needs to be involved because both she and K.B. are willing to help appellant. M.H. indicated that her "only concern with the kids being [placed] with [K.B.] is [she has] not * * * been able to have involvement because [K.B.]'s schedule is so busy."

{¶ 42} M.H. stated that the children "love" appellant and "have a very strong attachment" to appellant. M.H. believes appellant has been "trying very hard" and has "made major

improvements" in her quest to regain custody of the children. M.H. explained that appellant avoids people who will tempt her with drugs and is trying to get into a Suboxone program.

{¶ 43} On October 4, 2017, after hearing all of the evidence and counsels' arguments, the trial court granted appellee permanent custody of the children. The court found that the children have been in appellee's temporary custody for more than twelve months out of the past twenty-two consecutive months and that placing the children in appellee's permanent custody is in their best interest. The court considered the children's interactions and interrelationships and stated:

> The children are placed together, and have a reasonable sibling bond. They have been in the care of E.B.'s paternal grandmother for more than one year, and are comfortable, bonded, and well cared for. The children have a bond with their mother. They also have a relationship with maternal grandmother; however, she is in no position to provide for their daily care.

{¶ 44} The court next considered the children's wishes: "The children wish to stay with their grandmother [K.B.], where they are placed, and the oldest is mature enough to voice that mother cannot provide an appropriate home." The court also considered the children's custodial history:

> All three children have been continuously placed in the custody of ACCS since April 7, 2016. Prior to that they lived with their mother (and sometimes [J.B.]), often with a protective supervision order in place. During that time, the Court denied requests from ACCS to grant temporary custody until it became clearly necessary in April 2016.

The court additionally examined the children's need for a legally secure permanent placement:

> The children need and deserve a legally secure placement which can only be accomplished with a grant of permanent custody to ACCS, and the termination of parental rights. The grandparents with whom they are living have expressed a willingness and desire to adopt, and while that ultimate outcome cannot be

guaranteed, it would clearly be in their best interests.

The court thus placed the children in appellee's permanent custody.   This appeal followed.

**{¶ 45}** Appellant's two assignments of error challenge the trial court's decision to grant appellee permanent custody of the children.  Appellant's first assignment of error disputes the trial court's best-interest determination, while her second assignment of error asserts that the trial court erred by failing to consider whether placing the children in their maternal grandmother's custody would be in their best interest.  Because the two assignments of error involve related issues, we combine our discussion of them.

**{¶ 46}** In her first assignment of error, appellant asserts that the trial court's decision to place the children in appellee's permanent custody is against the manifest weight of the evidence. In particular, she contends that the weight of the evidence fails to establish that placing the children in appellee's permanent custody is in their best interest.  Appellant argues that (1) the best-interest factors weigh in favor of maintaining her parental rights to the children, (2) the evidence shows that she shares positive interactions and interrelationships with the children, (3) she and the children share a strong bond and that they had positive interactions during visits, (4) the evidence shows that the children would like to return home, and (5) she has made progress in showing that she can provide the children with a legally secure permanent placement, but she just needs more time.    In her second assignment of error, appellant argues that the trial court erred by granting appellee permanent custody of the children without examining whether placing the children with their maternal grandmother would be in their best interests.  She contends that had the trial court engaged in this best-interest analysis, it would have decided to place the children in the maternal grandmother's custody.

A

STANDARD OF REVIEW

{¶ 47} Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014–Ohio–3178, ¶27; *In re R.S.,* 4th Dist. Highland No. 13CA22, 2013–Ohio–5569, ¶29.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶12, quoting *State v. Thompkins,*78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).

{¶ 48} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court """"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."""" *Eastley* at ¶20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶23–24.

{¶ 49} The question that we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes,* 25 Ohio St.3d 101, 103–04, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay,* 25 Ohio St.3d 41, 42–43, 495 N.E.2d 9 (1986). *Cf. In re Adoption of Masa,* 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence"). Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re*

*R.M.,* 4th Dist. Athens Nos. 12CA43 and 12CA44, 2013–Ohio–3588, ¶62; *In re R.L.,* 2nd Dist. Greene Nos. 2012CA32 and 2012CA33, 2012–Ohio–6049, ¶17, quoting *In re A.U.,* 2nd Dist. Montgomery No. 22287, 2008–Ohio–187, ¶9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.'"). Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins,* 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'" *Thompkins,* 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; accord *State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶ 50} Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. *Eastley* at ¶21. As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * *
>
>    If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶ 51} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger,* 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian,* 4th Dist. Athens No. 04CA10, 2004–Ohio–3146, ¶7. As the Ohio Supreme Court long-ago explained:

> In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record.

*Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

{¶ 52} Furthermore, unlike an ordinary civil proceeding in which a jury has no contact with the parties before a trial, in a permanent custody case a trial court judge may have significant contact with the parties before a permanent custody motion is even filed. In such a situation, it is not unreasonable to presume that the trial court judge had far more opportunities to evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a mere reading of the permanent custody hearing transcript.

{¶ 53} In the case at bar, as we explain below, we are unable to conclude that the evidence weighs heavily against the trial court's decision.

B

PERMANENT CUSTODY PRINCIPLES

{¶ 54} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829, ¶¶8-9. A parent's rights, however, are not absolute. *D.A.* at ¶11. Rather, "'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶11.

{¶ 55} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.*

Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151, which include: "To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A).

C

PERMANENT CUSTODY FRAMEWORK

**{¶ 56}** A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, the agency sought permanent custody of the children by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

**{¶ 57}** R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) one of the following conditions applies:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
> (b) The child is abandoned.
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

**{¶ 58}** Thus, before a trial court may award a children services agency permanent custody, it must find (1) that one of the circumstances described in R.C. 2151.414(B)(1) applies,

and (2) that awarding the children services agency permanent custody would further the child's best interests.

## D

## R.C. 2151.414(B)(1)(d)

{¶ 59} In the case sub judice, the trial court determined that R.C. 2151.414(B)(1)(d) applies. Appellant does not dispute that the children have been in appellee's temporary custody for twelve or more months of a consecutive twenty-two month period. Instead, appellant disputes the trial court's best-interest finding. We limit our review accordingly.

## E

## BEST INTEREST

{¶ 60} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interests will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.[2]

---

[2] R.C. 2151.414(E)(7) to (11)(7) state:

The parent has been convicted of or pleaded guilty to one of the following:

(a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;

(b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

© An offense under division (B)(2) of section 2919.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;

(d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(e) An offense under section 2905.32, 2907.21, or 2907.22 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;

(f) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a), (d), or (e) of this section.

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 61} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, 862 N.E.2d 816, ¶57, citing *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, 857 N.E.2d 532, ¶56; *accord In re C.G.,* 9th Dist. Summit Nos. 24097 and 24099, 2008–Ohio–3773, ¶28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP–590 and 07AP–591, 2008–Ohio–297, 2008 WL 224356, ¶19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 3rd Dist. Marion Nos. 9–15–37, 9–15–38, and 9–15–39, 2017–Ohio–142, 2017 WL 168864, ¶24; *In re A.C.,* 9th Dist. Summit No. 27328, 2014–Ohio–4918, ¶46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016–Ohio–916, 2016 WL 915012, ¶66, citing *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

1

Interaction and Interrelationship

{¶ 62} Appellant consistently visited the children, and appeared to interact appropriately and lovingly with her children during their visits. The children also seemed to enjoy visiting their mother. Appellee did not express any major concerns regarding appellant's interactions with the children during her visits.

{¶ 63} Appellee, however, did express great concern with the mother's interaction and interrelationship with the children when the children were in her care. Even though we do not doubt appellant's love for her children, her conduct raises concerns regarding her willingness to provide her children with a healthy home. Appellant failed to refrain from substance abuse when the children were in her care. While appellant made some strides to address her substance abuse issues, she has not yet conquered her addiction. Instead, of the seven drug screens she took between in 2017, all but one of them were positive. Although appellant attempts to classify these six positive screens as mere "relapses," they show that appellant is not simply a casual user of drugs. Rather, the six positive drug screens indicate that appellant consistently abused drugs, even as the date of the permanent custody approached. She also readily admitted at the hearing that she last used drugs just a few weeks before the permanent custody hearing. Thus, even facing the termination of her parental rights, appellant continued to use drugs. Appellant's conduct thus unfortunately shows that she has not yet prioritized her children over her drug use.

{¶ 64} Furthermore, appellant was unable to maintain a sanitary environment for the children. Jeffers testified that appellant and J.B.'s apartment was littered with trash, dog feces, and dirty dishes.

{¶ 65} Additionally, appellant did not prioritize the children's education. Instead, the children had frequent truancy and tardiness issues. Thus, although appellant clearly loves her children, her conduct shows that she has not prioritized their health, safety, and welfare. Consequently, appellant's interrelationship with her children is not overly positive.

{¶ 66} On the other hand, K.B. has provided the children with a healthy home in which they have an opportunity to thrive, and she appears to prioritize the children's welfare. K.B.

ensures that the children consistently attend school and receive proper medical care. Additionally, the children appear well-adjusted to and content in K.B.'s home.

{¶ 67} The children's maternal grandmother dearly loves the children, as well. The maternal grandmother, however, currently has three other grandchildren under the age of ten living with her. While the record does not contain any evidence to suggest that appellant's children would not share positive interactions in the maternal grandmother's home, the trial court could have reasonably determined that placing three additional children under the age of ten in the grandmother's home would be taxing for all concerned and could quickly become chaotic. We further note that the maternal grandmother seems to believe that two of the other grandchildren soon will be returned to their mother. Her belief, however, will not necessarily prove to be true. Thus, we cannot fault the trial court for considering the grandmother's current circumstances, instead of considering whether the grandmother's current charges might be reduced to one. Additionally, when the children lived with their maternal grandmother on past occasions, S.S.-1 had truancy issues. Thus, unlike K.B., the maternal grandmother did not ensure that S.S.-1 consistently attended school.

2

Children's Wishes

{¶ 68} The children have asked appellant when they can return to living with her, but they also have expressed satisfaction with remaining in K.B.'s home. The guardian ad litem recommended that the court award appellee permanent custody of the children. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶32, citing *C.F.* at ¶55 (noting that R.C. 2151.414

permits court to consider child's wishes as child directly expresses or through the guardian ad litem).

### 3

### Custodial History

{¶ 69} Appellant had full custody of the children until 2014, when appellee became involved with the family. The court adjudicated the children dependent in May 2014. Between 2014 and 2016, appellee had a protective supervision order in place. In 2016, the court placed the children in appellee's temporary custody. Since that time, the children have lived with K.B.

### 4

### Legally Secure Permanent Placement

{¶ 70} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016–Ohio–793, 2016 WL 818754, ¶56, citing *In re Dyal,* 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.,*10th Dist. Franklin Nos. 15AP–64 and 15AP–66, 2015–Ohio–4682, ¶28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.,* 11th Dist. Lake No. 2012–L–126, 2013–Ohio–1293, ¶95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.,* 171 Ohio App.3d 248, 2007–Ohio–2007, 870 N.E.2d

245, ¶34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* At 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶56.

{¶ 71} In the case sub judice, appellee has been working with appellant since 2014. Throughout all this time, appellant has not established that she has a legally secure permanent placement for the children. Appellant continues to abuse drugs, and she currently lives in a camper. Moreover, when the children were in her custody, she bounced between her mother's and J.B.'s mother's houses before obtaining an apartment with J.B. Once she obtained that apartment, the evidence shows that she and J.B. were unable to maintain it in a sanitary condition.

{¶ 72} Appellant nevertheless asserts that the trial court should have afforded her additional time to establish a legally secure permanent placement for the children. The permanent custody statutes do not, however, contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to gain a legally secure permanent placement. *See* R.C. 2151.415(D)(4) (prohibiting court from granting "an agency more than two extensions of temporary custody" and from ordering "an existing temporary custody order to continue

beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered pursuant to division (D) of this section"). Additionally, keeping children in limbo is not in their best interests. *In re B.C.,* 141 Ohio St.3d 55, 2014–Ohio–4558, 21 N.E.3d 308, ¶ 20, quoting *Lehman v. Lycoming Cty. Children's Servs. Agency,* 458 U.S. 502, 513–514, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982) ("'There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current "home," under the care of his parents or foster parents, especially when such uncertainty is prolonged.'").

**{¶ 73}** As we already noted, in the case sub judice appellant had worked with appellee for more than three years by the time of the permanent custody hearing. During that time, appellant failed to establish a legally secure permanent placement. While we cannot discount the efforts that appellant has made to improve her situation, she has not shown why she could not make sufficient progress over the three-year period of appellee's involvement so that placing the children with her could have been a realistic possibility. We therefore disagree with appellant that the trial court should have given her more time to obtain a legally secure permanent placement.

**{¶ 74}** While we recognize appellant's concern that the trial court did not adequately consider the maternal grandmother as a possible placement for the child, we point out that a trial court need not determine that terminating parental rights is "the only option" or that no suitable person is available for placement. *In re Schaefer,* 111 Ohio St.3d 498, 2006–Ohio–5513, ¶64 (2006). Rather, R.C. 2151.414 requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.* "The statute does not make the availability of a placement

that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* A child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991). Therefore, courts are not required to favor relative or non-relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Schaefer* at ¶64; *accord In re T.G.,* 4th Dist. Athens No. 15CA24, 2015–Ohio–5330, ¶24; *In re V.C.,* 8th Dist. Cuyahoga No. 102903, 2015–Ohio–4991, ¶61 (stating that relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest). Additionally, we observe that "[i]f permanent custody is in the child's best interest, legal custody or placement with [a parent or other relative] necessarily is not." *In re K.M.,* 9th Dist. Medina No. 14CA0025–M, 2014–Ohio–4268, ¶9.

{¶ 75} In the case at bar, we determined that clear and convincing evidence supports the trial court's finding that awarding appellee permanent custody is in the children's best interest. Thus, placement with the maternal grandmother necessarily is not. Additionally, although the maternal grandmother's home might constitute a legally secure permanent placement, she presently has custody of three other grandchildren. The trial court could have rationally decided that placing an additional three children under the age of ten in the grandmother's home would result in a chaotic environment that would not serve the children's best interests. Additionally, it is not clear whether the grandmother intended to provide the children with a permanent home, or merely a temporary home until/if appellant ever becomes able to provide the children with a permanent home.

{¶ 76} Furthermore, we recognize that "[f]amily unity and blood relationship" may be "vital factors" to consider, but neither is controlling. *In re J.B.,* 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1703, ¶31. Indeed, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case." *In re T.S.,* 8th Dist. Cuyahoga No. 92816, 2009–Ohio–5496, ¶35. Thus, while biological relationships may be important considerations, they are not controlling when ascertaining a child's best interest. *In re J.B.,* 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013–Ohio–1706, ¶111. Consequently, the trial court was not required to favor an option that would have preserved a familial relationship with the maternal grandmother when the circumstances show that the children's best interests would be better served by placing them in appellee's permanent custody.

{¶ 77} We also recognize that appellee's stated intention is to preserve the familial relationship with K.B. Appellee and K.B. hope that K.B.'s home will become the children's adoptive home. K.B. stated that she would allow appellant to visit the children as much as possible.

5

Balancing

{¶ 78} Considering all of the foregoing circumstances, we are unable to conclude that the trial court's best-interest determination is against the manifest weight of the evidence. The evidence indicates that the children did not have a consistent and stable home while in appellant's care. Instead, they shuffled back and forth between appellant, appellant's mother, and J.B.'s mother. Although appellant obtained an apartment where they all lived together for

approximately one year, she did not keep it in a sanitary condition. The two oldest children did not consistently attend school and were often late, which their principal stated negatively affected their behaviors. Furthermore, the children displayed dental issues and S.S.-1 had a large boil on her leg that affected her walking ability. Sadly, appellant was unable to maintain sobriety and continued to test positive for drugs just a few weeks before the permanent custody hearing. Appellant does not have an appropriate home for the children. K.B., however, has an appropriate home for the children and has provided them with the care that they need. Even though appellant and the children share a strong bond and the children have expressed a desire to return home, appellant has not shown that she can prioritize her children's needs over her drug use. K.B., on the other hand, prioritizes the children's needs. Additionally, even if the maternal grandmother's home is physically appropriate, she currently has custody of three other grandchildren under the age of ten. Placing S.S.-1, S.S.-2, and E.B. into this same environment could create chaos and would not provide the same guarantees of stability that the children will achieve by being placed in appellee's permanent custody. Consequently, we do not agree with appellant that the trial court's best-interest determination is against the manifest weight of the evidence. For similar reasons, we do not believe that the trial court erred by failing to engage in a detailed analysis regarding the maternal grandmother as a potential placement for the children. The court's finding that placing the children in appellee's permanent custody is in their best interest necessarily shows that placing them in the maternal grandmother's custody is not.

{¶ 79} Accordingly, based upon the foregoing reasons, we overrule appellant's two assignments of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the appeal be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hoover, P.J. & McFarland, J.: Concur in Judgment & Opinion

For the Court

BY:_____

Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.