**[Cite as *In re C.E.*, 2025-Ohio-5641.]**

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

IN RE:  C.E. JR.            :
        E.E.
        L.E.               : Case No. 25CA4134
        P.E.
                           : DECISION AND JUDGMENT ENTRY
Adjudicated Neglected/
Dependent Children.        :

_____

APPEARANCES:

Alana Van Gundy, Bellbrook, Ohio, for appellant.[1]

Shane A. Tieman, Scioto County Prosecuting Attorney, and S.
Andrew Sturgill, Scioto County Assistant Prosecuting Attorney,
Portsmouth, Ohio, for appellee.
_____

CIVIL CASE FROM COMMON PLEAS COURT, JUVENILE DIVISION
DATE JOURNALIZED:12-10-25
Abele, J.

{¶1}  This is an appeal from a Scioto County Common Pleas
Court, Juvenile Division, judgment that granted Scioto County
Children Services, appellee herein, permanent custody of C.E.,
Jr., E.E., L.E., and P.E.

{¶2}  Appellant, the children's biological mother, raises
the following assignments of error for review:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN FINDING THAT THE
AGENCY MADE REASONABLE EFFORTS TO PREVENT

_____

[1] Different counsel represented appellant during the trial court
proceedings.

THE REMOVAL OF THE CHILDREN AND TO REUNIFY
THE FAMILY, DESPITE SUBSTANTIAL AND
UNJUSTIFIED DELAYS AND OMISSIONS IN SERVICE
PROVISION, AND WHERE THE AGENCY CASEWORKER
RELIED ON A SUBJECTIVE JUDGMENT THAT THE
MOTHER WAS MERELY CHECKING BOXES RATHER THAN
DEMONSTRATING BEHAVIORAL CHANGE."
SECOND ASSIGNMENT OF ERROR:

"THE JUVENILE COURT ERRED IN FINDING THAT
PERMANENT CUSTODY WAS IN THE BEST INTEREST
OF THE CHILDREN, WHEN THAT FINDING WAS NOT
SUPPORTED BY SUFFICIENT EVIDENCE AND WAS
AGAINST THE MANIFEST WEIGHT OF THE
EVIDENCE."

**{¶3}** Appellee has been involved with the family since January 2021, when the oldest child, C.E., Jr., was close to two years of age, and the three younger children had yet to be born. At the time, appellee's primary concerns involved the home environment. An agency caseworker reported that the home was not sanitary and that C.E., Jr. had bite marks or rashes on his extremities and face.

**{¶4}** Appellee subsequently filed a complaint that alleged that C.E., Jr. was a "neglected/dependent child." The complaint requested the trial court to place the child in appellee's temporary custody. Appellee also asked the court for an emergency ex parte order placing the child in its temporary custody, which the trial court granted.

**{¶5}** The trial court later adjudicated C.E., Jr. a "neglected/dependent" child.

**{¶6}** Shortly thereafter, on March 2, 2021, appellant gave

birth to E.E.  Two days later, appellee filed a complaint that alleged E.E. was a "neglected/dependent child."  Appellee alleged that, when appellant was admitted to the hospital to give birth, she tested positive for marijuana.  Appellee further stated that the living conditions of appellant's home had remained unchanged since C.E., Jr.'s removal.  Appellee asked the court to place E.E. in its temporary custody.  The court subsequently placed E.E. in appellee's temporary custody pending adjudication and disposition.

{¶7}  Approximately two months later, the trial court adjudicated E.E. a "neglected/dependent child."

{¶8}  On May 25, 2021, the court entered a dispositional order that placed C.E., Jr. and E.E. in appellee's temporary custody.  The court found that appellee had "made all reasonable efforts to prevent" the children's continued removal from the home.

{¶9}  In January 2022, the court held an annual review hearing.  The court found that appellee had used reasonable efforts to implement the plan to return the children to the parents' custody and continued the children in appellee's temporary custody for six months.

{¶10} In March 2022, appellant gave birth to twins, L.E. and P.E.  The twins remained in the parents' home while the two older children's cases progressed.

{¶11} By June 2022, the two older children had been visiting the parents without any reported problems. The goal at that point was to begin unsupervised visits at the family's home, and if those visits went well, appellee planned to allow the children to be placed on an extended home visit.

{¶12} At the end of December 2022, appellee placed C.E., Jr. and E.E. with the parents for a trial visit.

{¶13} On January 30, 2023, after an annual review hearing, the court continued the children in appellee's temporary custody. The court stated that the children had been placed with the parents for a trial home placement and indicated that additional time was "needed to ensure placement is appropriate." The court further stated that "[b]arring a change of circumstances, it is not [appellee]'s intention to file a Motion for Permanent Custody." The court found that appellee had used reasonable efforts to return the children to the parents' custody.

{¶14} The next day appellee filed complaints that alleged that the twins were neglected and dependent children. The complaint alleged that, on January 31, 2023, appellee learned that the twins' older sibling, E.E., tested positive for marijuana and required emergency medical treatment. Appellee requested the trial court to place the twins in its temporary custody. The court subsequently entered an ex parte emergency

order that placed the children in appellee's temporary custody.

{¶15} In April 2023, the GAL filed a report and recommendation in which he noted that, after the parents apparently had satisfied the case plan requirements set forth in C.E., Jr.'s and E.E.'s cases, appellee had placed the two children in the home for a trial visit. The GAL pointed out, however, that the trial visit "failed miserably." He recommended that the court place the children in appellee's temporary custody.

{¶16} After E.E.'s medical emergency, appellee developed a new case plan. This case plan stated that the parents needed to demonstrate the ability to properly supervise the children and to understand the necessity of keeping drugs and alcohol out of the house. The case plan required the parents to complete parenting classes, a drug and alcohol assessment and any recommended treatment, a mental health assessment, and individual counseling.

{¶17} On May 12, 2023, the court adjudicated the twins dependent. Shortly thereafter, the court entered a dispositional order that placed the twins in appellee's temporary custody.

{¶18} On December 20, 2023, appellee filed a motion to modify the disposition to permanent custody. Appellee asserted that the two older children had been in its temporary custody

for 12 or more months of a consecutive 22-month period. The agency further alleged that the four children could not be placed with either parent within a reasonable time or should not be placed with either parent.

{¶19} A few months later, the agency filed an amended motion to modify the disposition to permanent custody. The agency alleged that the twins now had been in its temporary custody for 12 or more months of a consecutive 22-month period. The agency further alleged that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶20} On July 15, 2024, the court held a hearing to consider appellee's permanent custody motion. Dr. Matthew Suer testified that, on January 31, 2023, E.E. presented to the emergency department at Nationwide Children's Hospital with "severe neurologic depression" and required intubation. Dr. Suer explained that the child "was so sedated there were concerns that he could not protect his airway." The medical team determined that the child had ingested and overdosed on marijuana.

{¶21} The family's caseworker, Jennifer Conley, testified that she had worked with the family since March 2023. C.E., Jr. was removed because the home environment was infested with roaches and otherwise was unsanitary, and E.E. was removed at

birth due to the same concerns.  Additionally, appellant had tested positive for THC upon E.E.'s birth, and E.E.'s cord blood tested positive for THC.

{¶22} In March 2022, when the twins were born, appellee did not remove them from the parents.  Instead, the twins remained at the parents' home, and appellee continued its efforts to reunify C.E., Jr. and E.E. with the parents.

{¶23} In line with those efforts, at the end of December 2022, appellee placed C.E., Jr. and E.E. in the parents' home for a trial visit.  About one month later, E.E. overdosed on marijuana.  As a result, appellee terminated the trial visit and removed the twins from the parents' custody.  The children have remained in appellee's temporary custody since that time.

{¶24} Given E.E.'s overdose, appellee determined that the parents would need to essentially start from the beginning and "redo much of the things that they had to do in their previous case plan," such as mental health and drug and alcohol assessments.  Both parents initially completed assessments, and appellant remained drug free for a large part of the case. Appellant did not, however, immediately engage in mental health treatment.

{¶25} In August 2023, Conley met with the parents to discuss the case plan and appellee's concerns.  Appellant "was very upset with the way that her case had been handled up to that

point.  She was very confrontational, [and] somewhat aggressive towards [Conley]."  After the August 2023 meeting, however, appellant "became more receptive to listening to" appellee's concerns.  Conley explained that, during this August 2023 meeting, she had advised appellant that she needed to seek treatment for her mental health issues.

{¶26} Conley did not believe that either appellant or the children's father had taken responsibility for their actions or recognized that their improper supervision caused E.E.'s overdose.  Conley expressed concerns that the parents "were completing the services on the case plan in an effort to check off the box, rather than to utilize the service to try to change the behaviors that we had encountered that prompted [appellee] to remove the children from their care."  As an example, she stated that, when appellee developed a case plan, appellee expected the parents to complete a mental health assessment and then follow any recommended treatment.  The parents completed assessments, but they did not follow through with treatment recommendations.  Appellant later reported to Conley that she started taking mental health medications, but appellant indicated that she started taking the medication "to make [Conley] happy."

{¶27} Conley also indicated that the parents did not consistently maintain a clean home.  She stated that the

caseworkers would visit the home on one occasion, and it would be clean; but on subsequent visits, the home would not be clean. Conley suggested that appellee was looking for a sustained behavioral change rather than returning to the home and observing the same concerns: "animal feces on the floor . . ., trash all over the place . . ., [and] clothes all over the place. . . ."

{¶28} Conley stated that she talked to the parents about obtaining a lockbox for their THC products and attempted to obtain funds to help them with the purchase of a lockbox.  She was unable to obtain approval for the purchase, however.

{¶29} Conley explained that she also had reviewed the family's case file.  In doing so, she noticed that, in June 2019, the parents previously had another child, A.E., placed in appellee's permanent custody.

{¶30} In November 2023, caseworkers visited the parents at their home.  During the visit, appellant and the father tested positive for THC.  Up until that time, appellant had been drug free.  After the visit, appellee decided to seek permanent custody of the children.

{¶31} Conley explained that appellee decided to seek permanent custody of the children for some of the following reasons:  (1) both C.E., Jr. and E.E. had been in appellee's temporary custody for more than two years; (2) the parents only

recently started to display efforts to indicate "some kind of sustained change that would make it so that their children would remain safe when they are in their care"; and (3) appellee had concerns about the "previous substantiated neglect and physical abuse incidents" and whether these issues would recur without appellee's involvement.

{¶32} Conley stated that, before seeking permanent custody, appellee had been attempting to reunify the two older children with the parents and had placed them on a trial home visit for that purpose. She explained that if E.E. had not overdosed on marijuana, then appellee would have continued its attempt to reunify the family. Instead, because E.E.'s overdose was serious, appellee removed the twins from the home. The incident caused appellee to become "very, very cautious about risking the children's safety further." Appellee additionally had concerns that the parents did not have any logical explanation for the incident.

{¶33} The four children currently are placed in the same foster home and are bonded to one another. The children are "doing very well" and "thriving" in the foster home. The foster family is interested in adopting the children.

{¶34} The children's guardian ad litem (GAL) testified that he did not believe that appellee had used reasonable efforts earlier in the case to reunify the two older children with the

parents.  The GAL did not think that returning the children to the parents at the time of the permanent custody hearing would be in their best interest, but he also did not believe that the court should place the children in appellee's permanent custody. The GAL instead opined that appellee should work on reunifying the family.  In the meantime, he indicated that the children should remain with the foster family.

{¶35} On April 23, 2025, the trial court granted appellee permanent custody of the children.  The court found that the children had been in appellee's temporary custody for 12 or more months of a consecutive 22-month period.  The court also determined that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶36} The trial court noted that appellee attempted to reunify the parents and the two older children, but appellee terminated reunification efforts after E.E. overdosed on marijuana during the trial home visit.  The court also noted that the parents had their parental rights terminated with respect to the children's older sibling.  The court recognized that the parents had made "some improvements and case plan progress."  The court, however, shared the caseworker's concern that "the parents have demonstrated only a desire to complete services, not long-term behavior changes."  The court concluded

that "the parents have failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination" of their parental rights with respect to the children's sibling, they "can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child[ren], pursuant to R.C. 2151.414(E)(11)."

{¶37} The trial court next considered the children's best interest.  The court stated that the parents' relationship with the children had "been partly maintained" through visitations. The court further observed that the two older children had been in appellee's temporary custody for over three years and remained in the same foster home for the majority of that time. The twins have been in appellee's temporary custody for more than one year and have been placed in the same foster home with their older siblings.  The foster provider has been a "consistent caretaker" for the children, and the children appear "well-bonded with their foster parents and siblings outside of their parents' home."  The court additionally found that maintaining the bond between the children is in their best interest.

{¶38} The trial court noted that the GAL's report had not expressed the children's wishes.  The court further observed that the children were under the age of five "and may be too young to express their wishes."  The court nonetheless stated

that it had "considered the testimony in evaluating the child[ren]'s wishes."

{¶39} The trial court considered the children's custodial history and found that all four children had been in appellee's temporary custody for 12 or more months of 22-month period. The court pointed out that C.E., Jr. has been in appellee's temporary custody since he was two years of age, and E.E. has been in appellee's temporary custody "his entire life."

{¶40} The trial court also concluded that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting appellee permanent custody. The court found that even though the children have been in the agency's temporary custody for a significant period of time, the parents "have not prioritized changing their own behavior and cannot demonstrate their ability to care for all the children without [appellee's] involvement."

{¶41} The trial court noted that the foster provider "has shown a willingness to adopt the children" and pointed out that the children have experienced "the most stability together" while in the foster home. The court acknowledged the GAL's recommendation but determined that the children could not be returned to their parents. The court thus determined that placing the children in appellee's permanent custody would serve their best interest.

**{¶42}** The trial court also concluded that R.C. 2151.414(D)(2) applied to the two older children.  The court stated that in accordance with that provision, it "must find that permanent custody" is in their best interest.  The court therefore granted appellee permanent custody of the children. This appeal followed.

I

**{¶43}** In her first assignment of error, appellant asserts that the trial court erred by finding that appellee used reasonable efforts to prevent the children's removal and to reunify the family.  She contends that appellee did not "initiate visitation between the child[ren] and the parents for more than a year."  She states that appellee filed C.E., Jr.'s complaint in January 2021, and E.E.'s complaint in March 2021, yet as of April 27, 2022, visits still had not occurred. Appellant argues that failing to permit visitation deprived her "of critical opportunities to bond with the children, comply with visitation objectives, and demonstrate parenting capacity."

**{¶44}** Appellant additionally contends that the caseworker "dismissed [her] progress as simply 'checking the boxes'" and did not believe that appellant had made "meaningful behavioral changes."  Appellant argues that she "completed her case plan multiple times and some components of the case plan—four times." She states that she (1) "had housing at multiple times," (2)

"completed four assessments," (3) "began taking her medicine,"

(4) "completed parenting classes," (5) held a steady job, and

(6) "regularly attended visitation." Appellant asserts that

appellee's "failures to set up visitation in a timely manner

combined with a subjective, unsupported conclusion that

[appellant]'s efforts lacked sincerity do not satisfy the legal

requirement of reasonable efforts."

{¶45} Appellant also faults appellee for failing "to provide

the parents with a drug lockbox."

{¶46} When a trial court "removes a child from the child's

home or continues the removal of a child from the child's home,"

R.C. 2151.419(A)(1) requires a trial court to determine whether

a children services agency "made reasonable efforts to prevent

the removal of the child from the child's home, to eliminate the

continued removal of the child from the child's home, or to make

it possible for the child to return safely home." "In

determining whether reasonable efforts were made, the child's

health and safety shall be paramount." R.C. 2151.419(A)(1).

The agency bears the burden to prove that it has made reasonable

efforts. R.C. 2151.419(A)(1).

{¶47} However, R.C. 2151.419(A)(1) applies only at

"adjudicatory, emergency, detention, and temporary-disposition

hearings, and dispositional hearings for abused, neglected, or

dependent children . . . ." *In re C.F.*, 2007-Ohio-1104, ¶ 41;

*accord In re C.B.C.*, 2016-Ohio-916, ¶ 72 (4th Dist.).  Thus,

"'[b]y its plain terms, the statute does not apply to motions

for permanent custody brought pursuant to R.C. 2151.413, or to

hearings held on such motions pursuant to R.C. 2151.414.'"  *C.F.*

at ¶ 41, quoting *In re A.C.*, 2004-Ohio-5531, ¶ 30 (12th Dist.).

Nonetheless, "[t]his does not mean that the agency is relieved

of the duty to make reasonable efforts" before seeking permanent

custody.  *Id.* at ¶ 42.  Instead, at prior "stages of the child-

custody proceeding, the agency may be required under other

statutes to prove that it has made reasonable efforts toward

family reunification."  *Id.*  Additionally, "[if] the agency has

not established that reasonable efforts have been made prior to

the hearing on a motion for permanent custody, then it must

demonstrate such efforts at that time."  *Id.* at ¶ 43.

**{¶48}** In the case sub judice, appellant's appeal does not

originate from one of the types of hearings specifically listed

in R.C. 2151.419(A):  "adjudicatory, emergency, detention, and

temporary-disposition hearings, and dispositional hearings for

abused, neglected, or dependent children."  Appellee, therefore,

did not have the burden to prove at the permanent custody

hearing that it used reasonable efforts to reunify the family,

unless it had not previously done so.  Here, our review of the

record reflects that the trial court made multiple reasonable

efforts findings before the agency filed its permanent custody

motion. Thus, the court did not need to again find that the agency used reasonable efforts before it could grant the agency permanent custody of the children. *E.g., In re M.H.-L.T.*, 2017-Ohio-7825, ¶ 64 (4th Dist.); *In re S.S.*, 2017-Ohio-2938, ¶ 168 (4th Dist.).

**{¶49}** Moreover, to the extent that appellant disagrees with any of the trial court's reasonable efforts findings made after adjudication or disposition, we point out that she could have appealed those findings when the trial court entered final orders. Her failure to timely appeal the findings contained in those orders means that they now are res judicata. *See In re Bil.I.*, 2023-Ohio-434, ¶ 30 (10th Dist.) (failing to timely appeal reasonable efforts findings prevented parents from later challenging those findings on appeal from permanent custody judgment); *In re B.F.*, 2021-Ohio-4251, ¶ 21 (3d Dist.) ("because [the parents] could have raised their challenges to the trial court's first four reasonable-efforts findings on appeal from [the child]'s adjudication and initial disposition, res judicata now precludes [the parents] from making these arguments"); *see also In re L.S.*, 2020-Ohio-5516, ¶ 31 (4th Dist.) (res judicata barred parents from challenging reasonable-efforts findings in the trial court's shelter-care order because "the parents could have raised the issue in a direct appeal from the court's dispositional order").

{¶50} We also observe that the evidence shows that appellant had her parental rights involuntarily terminated with respect to a sibling of the children.  Thus, R.C. 2151.419(A)(2)(e) relieved appellee of the duty to use reasonable efforts "to prevent the removal of the child[ren] from [their] home, eliminate the continued removal of the child[ren] from [their] home, and return the child[ren] to [their] home."  *See In re C.J.*, 2017-Ohio-5782, ¶ 49 (4th Dist.).

{¶51} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

                                  II

{¶52} In her second assignment of error, appellant asserts that the record does not contain sufficient evidence to support the trial court's finding that permanent custody is in the children's best interest and that its finding is against the manifest weight of the evidence.  She does not contest the court's finding that the children had been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.  Instead, appellant challenges the trial court's best interest finding.  She argues that she completed her case plan, had adequate housing, was employed, was receiving mental health treatment, and "was willing to continue her medication." Appellant asserts that appellee failed to establish that she "could not parent her [c]hildren" and "did not produce evidence

that [her] children continued to be at risk."

A

**{¶53}** Generally, a reviewing court will not disturb a trial court's permanent custody judgment unless the judgment is against the manifest weight of the evidence. *E.g., In re B.E.*, 2014-Ohio-3178, ¶ 27 (4th Dist.); *In re R.S.*, 2013-Ohio-5569, ¶ 29 (4th Dist.); *accord In re Z.C.*, 2023-Ohio-4703, ¶ 1.

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'"

*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶54}** When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court "'"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."'" *Eastley*, 2012-Ohio-2179,

at ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist. 2001), quoting *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord In re Pittman*, 2002-Ohio-2208, ¶ 23-24 (9th Dist.).  We further observe, however, that issues that relate to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984):

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger*, 77 Ohio St.3d 415, 419 (1997); *accord In re Christian*, 2004-Ohio-3146, ¶ 7 (4th Dist.).

{¶55} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings ... were supported by clear and convincing evidence." *In re K.H.*, 2008-Ohio-4825, ¶ 43. "Clear and convincing

evidence" is

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established.  It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases.  It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04 (1986).  In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990)*; accord In re Holcomb*, 18 Ohio St.3d 361, 368 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."); *In re Adoption of Lay*, 25 Ohio St.3d 41, 42-43 (1986); *compare In re Adoption of Masa*, 23 Ohio St.3d 163, 165 (1986) (whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence").

{¶56} Thus, if a children services agency presented

competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, the court's decision is not against the manifest weight of the evidence.  *In re R.M.*, 2013-Ohio-3588, ¶ 62 (4th Dist.); *see also In re R.L.*, 2012-Ohio-6049, ¶ 17 (2d Dist.), quoting *In re A.U.*, 2008-Ohio-187, ¶ 9 (2d Dist.) ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements . . . have been established.'").

{¶57} Once a reviewing court finishes its examination, the judgment may be reversed only if it appears that the fact-finder, when resolving the conflicts in evidence, "'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175.  A reviewing court should find a trial court's permanent custody judgment against the manifest weight of the evidence only in the "'exceptional case in which the evidence weighs heavily against the [decision].'"  *Id.*, quoting *Martin*, 20 Ohio App.3d at 175; *see Black's* (12th ed. 2024) (the phrase "manifest weight of the evidence" "denotes a deferential standard of

review under which a verdict will be reversed or disregarded only if another outcome is obviously correct and the verdict is clearly unsupported by the evidence").

{¶58} A reviewing court also may reverse a trial court's permanent custody judgment if the record does not contain sufficient evidence to support it.  *See Z.C.*, 2023-Ohio-4703, at ¶ 1.  When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether "the evidence is legally sufficient to support the [judgment] as a matter of law."  *See Thompkins*, 78 Ohio St.3d at 386.  Additionally, as we have stated in previous cases, a finding that a judgment is supported by the manifest weight of the evidence is "also dispositive of the issue of sufficiency."  *State v. Waller*, 2018-Ohio-2014, ¶ 30 (4th Dist.); *e.g., State v. McKinney*, 2024-Ohio-4642, ¶ 63 (4th Dist.) ("a determination that the weight of the evidence supports a conviction also is dispositive of an insufficient-evidence claim").  We therefore first consider the potentially dispositive issue:  whether the weight of the evidence supports the trial court's judgment.

B

{¶59} Courts must recognize that "parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by th[e

United States Supreme] Court.'"  *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Indeed, "the right to raise one's children is an 'essential' and 'basic' civil right."  *In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *accord In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("natural parents have a fundamental right to the care and custody of their children"). Thus, "parents who are 'suitable' have a 'paramount' right to the custody of their children."  *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *Murray*, 52 Ohio St.3d at 157.

**{¶60}** A parent's rights, however, are not absolute.  *In re D.A.*, 2007-Ohio-1105, ¶ 11.  Rather, "'it is plain that the natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'"  *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974).  Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

**{¶61}** Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing.  The primary purpose of the hearing is

to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. *Id.* Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A).

C

{¶62} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect, or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, appellee sought permanent custody by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).

{¶63} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent

custody and that, as relevant in the case sub judice, "[t]he child has been in the temporary custody of one or more public children services agencies ... for twelve or more months of a consecutive twenty-two-month period. . . ." R.C. 2151.414(B)(1)(d).

{¶64} In the case at bar, the trial court found that the children had been in appellee's temporary custody for more than 12 months of a consecutive 22-month period. Appellant does not challenge this finding on appeal. We therefore do not address it.

D

{¶65} R.C. 2151.414(D) lists the factors that a trial court considers when determining whether permanent custody will serve a child's best interest. The statute directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a

legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶66} Courts that must determine whether a grant of permanent custody to a children services agency will promote a child's best interest must consider "all relevant [best interest] factors," as well as the "five enumerated statutory factors."  *C.F.*, 2007-Ohio-1104, at ¶ 57, citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56; *accord In re C.G.*, 2008-Ohio-3773, ¶ 28 (9th Dist.); *In re N.W.*, 2008-Ohio-297, ¶ 19 (10th Dist.). However, none of the best interest factors is entitled to "greater weight or heightened significance."  *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination.  *In re K.M.S.*, 2017-Ohio-142, ¶ 24 (3d Dist.); *In re A.C.*, 2014-Ohio-4918, ¶ 46 (9th Dist.).  In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security."  *In re C.B.C.*, 2016-Ohio-916, ¶ 66 (4th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

Children's Interactions and Interrelationships

{¶67} The children are placed in the same foster home and are bonded to one another.  The foster family provides the

children with all of their essential needs.  By all accounts, the children are thriving in the foster home.

{¶68} Appellee did not present any evidence to suggest that, during visitation, the parents failed to interact appropriately with the children.  Moreover, appellee did not seek to remove the twins from the parents' custody.  Thus, on the surface, the evidence tends to show that the parents interacted appropriately with the children.

{¶69} However, when appellee placed the two oldest children in the parents' home for a trial visit, E.E. overdosed on marijuana.  Neither parent had a logical explanation for the overdose.  The parents' lack of explanation for the overdose caused appellee to be wary of returning the children to the parents' home and to question appellant's protective capacities.

### Children's Wishes

{¶70} The children's GAL did not believe that appellee had exercised reasonable efforts to reunify the family and that the court should give appellee time to gradually reintroduce the children into the parents' household.

{¶71} At the time of the permanent custody hearing, all of the children were under the age of six.  The trial court determined that the children lacked sufficient maturity to be able to directly express their wishes.

### Custodial History

{¶72} C.E., Jr. lived with his parents until January 2021, when he was almost two years of age. Since that time, he has remained in appellee's temporary custody. When appellee filed its December 2023 permanent custody motion, C.E., Jr. had been in appellee's temporary custody for almost three years.

{¶73} Appellee removed E.E. from the parents' custody in March 2021, shortly after his birth. He since has remained in appellee's temporary custody. When appellee filed its December 2023 permanent custody motion, E.E. had been in appellee's temporary custody for almost three years.

{¶74} The twins lived with their parents for the first ten months of their lives. After E.E.'s overdose, the twins were removed from the parent's custody and have remained in appellee's temporary custody since that time. When appellee filed its amended 2024 permanent custody motion, the twins had been in its temporary custody for more than 12 months.

{¶75} The children's custodial history thus shows that they have spent the majority of their young lives in appellee's temporary custody.

Legally Secure Permanent Placement

{¶76} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be

met."  *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.), citing *In re Dyal*, 2001 WL 925423, *9 (4th Dist. Aug. 9, 2001) ("legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 2015-Ohio-4682, ¶ 28 (10th Dist.) (legally secure permanent placement requires more than a stable home and income, but also requires an environment that will provide for child's needs); *In re J.H.*, 2013-Ohio-1293, ¶ 95 (11th Dist.) (mother was unable to provide legally secure permanent placement when she lacked physical and emotional stability and father was unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 2007-Ohio-2007, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (legally secure permanent placement means "a placement that is stable and consistent"); *Black's* (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *id.* (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient").  Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."

*M.B.*, 2016-Ohio-793, at ¶ 56 (4th Dist.).

{¶77} In the case at bar, we believe that the evidence adduced at the hearing supports the trial court's finding that the children need a legally secure permanent placement and that they cannot achieve that type of placement without granting the agency permanent custody. Despite years of appellee's involvement and case planning efforts, appellant did not consistently demonstrate that she could provide the children with a legally secure permanent placement. We recognize and commend appellant for her efforts to improve her situation. Unfortunately, when appellee attempted to return C.E., Jr. and E.E. to the home, E.E. overdosed on marijuana. Appellant did not have a logical explanation for the overdose. The trial court could have reasonably determined that a home in which a child has the ability to overdose on marijuana, without any logical explanation, is not an environment in which a child will live in safety.

{¶78} Furthermore, even though appellant may have engaged in the services that appellee requested of her, case plan compliance is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency. *In re W.C.J.,* 2014-Ohio-5841, ¶ 46 (4th Dist.) ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and

does not preclude a grant of permanent custody to a children's

services agency."); *see In re M.H.*, 2017-Ohio-7365, ¶ 102 (4th

Dist.); *In re S.S.*, 2017-Ohio-2938, ¶ 164 (4th Dist.); *In re*

*M.B.*, 2016-Ohio-793, ¶ 59 (4th Dist.); *In re N.L.*, 2015-Ohio-

4165, ¶ 35 (9th Dist.) (stating that substantial compliance with

a case plan, in and of itself, does not establish that a grant

of permanent custody to an agency is erroneous"); *In re S.C.*,

2015-Ohio-2280, ¶ 40 (8th Dist.) ("Compliance with a case plan

is not, in and of itself, dispositive of the issue of

reunification."); *In re West*, 2003-Ohio-6299, ¶ 19 (4th Dist.).

Indeed, because the trial court's primary focus in a permanent

custody proceeding is the child's best interest, "it is entirely

possible that a parent could complete all of his/her case plan

goals and the trial court still appropriately terminate his/her

parental rights." *In re Gomer,* 2004-Ohio-1723, ¶ 36 (3d Dist.);

*accord In re A.S.*, 2014-Ohio-3035, ¶ 32 (8th Dist.).

Consequently, even if appellant complied with all of the case

plan services, these actions do not necessarily demonstrate that

placing the children in her custody would serve the children's

best interest.

R.C. 2151.414(E)(7) to (11)

**{¶79}** The trial court found that R.C. 2151.414(E)(11)

applied. The evidence shows that appellant had her parental

rights involuntarily terminated with respect to one of the

children' siblings, and the trial court determined that appellant "failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, [she] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child[ren]." As we explained above, the evidence supports the trial court's finding that appellant cannot provide the children with a legally secure permanent placement.

{¶80} For all of the foregoing reasons, we do not agree with appellant that the trial court's judgment granting appellee permanent custody of the children is against the manifest weight of the evidence. The trial court could have formed a firm belief that placing the children in appellee's permanent custody was in their best interest. We thus also conclude that the record contains sufficient evidence to support the trial court's judgment.

{¶81} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
    Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.