[Cite as *In re K.B.*, 2026-Ohio-1371.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

In re  K.B. 1 (DOB: 04/15/13)          :        Case Nos.    25CA15
      K.B. 2 (DOB: 10/13/14)          :                          25CA16

Adjudicated Dependent Children

           :        <u>DECISION AND</u>
             <u>JUDGMENT ENTRY</u>
           :

           **RELEASED 4/06/2026**

_____

<u>APPEARANCES</u>:

Christopher Bazeley, Cincinnati, Ohio, for appellant mother.

Richard D. Hixson, Zanesville, Ohio, for appellant father.

Keller J. Blackburn, Athens County Prosecuting Attorney and Sabrina Ennis, Assistant Athens County Prosecutor, Athens, Ohio, for appellee.

_____

Hess, J.

**{¶1}**  In this consolidated appeal mother and father appeal the judgment of the Athens County Court of Common Pleas, Juvenile Division, granting permanent custody of their two children to Athens County Children Services (the "Agency").  The mother and father contend that the permanent custody award was against the manifest weight of the evidence. Additionally, the father contends that the trial court erred in finding that the agency made reasonable efforts at reunification. We overrule the assignments of error and affirm the trial court's judgment.

I.  FACTS AND PROCEDURAL HISTORY

**{¶2}**  The Agency obtained an ex parte order for emergency custody of the children on May 18, 2023.  The following day, the Agency filed complaints and emergency

motions for custody and predispositional orders alleging that the children were abused, neglected, and dependent based on a volatile relationship between father and mother, untreated mental health issues both parents suffer, and financial irresponsibility of the father. Both children were alleged to feel unsafe in the home. The trial court granted the motions, continued emergency custody with the Agency, found that the Agency had made reasonable efforts to prevent the need for the removal of the children, and set an adjudication hearing for June 16, 2023. Prior to the June 16, 2023 hearing, the parties reached an agreement and the Agency dismissed the abuse and neglect allegations and the parents stipulated to a finding that the children were dependent. On July 20, 2023, the trial court issued a judgment entry that incorporated the parents' stipulation, adjudicated the children dependent, granted temporary custody to the Agency, and made a finding that the Agency had made reasonable efforts towards reunification.

{¶3}    Periodic reviews occurred over the next 18 months. Following each review, the trial court found that the Agency was making reasonable efforts toward reunification. Neither parent made any objections to the trial court's reasonable effort findings.  On January 9, 2025, the Agency filed a motion for permanent custody pursuant to R.C. 2151.413 and R.C. 2151.414. The Agency asserted that the children had been in the Agency's custody for 12 or more months of a consecutive 22-month period and that permanent custody to the Agency was in the best interest of the children. To support its motion, the Agency included an affidavit that stated that the mother has not benefited from mental health services and parenting classes, does not have an income to provide for the children's basic needs, and does not have stable, independent housing and that the father has failed to engage in mental health services and does not have stable,

independent housing. Finally, the affidavit stated that one of the children expressed that she does not wish to reunify with either parent. The permanent custody hearing was held over a two-day period, July 28 and July 29, 2025.

{¶4} Dr. Pittsenbarger, a licensed clinical psychologist, testified that she performed psychological assessments and interviews of both parents and described those assessments. Mother was diagnosed with PTSD, generalized anxiety disorder, and cannabis use disorder. Mother "endorsed a high level of interpersonal partner violence" with father. Mother was recommended for individual counseling, parenting classes, couples counseling, family therapy, and a psychiatric evaluation to determine whether psychiatric or psychotropic medication would be beneficial. However, individual counseling would be needed before couples and family counseling could begin.

{¶5} Dr. Pittsenbarger diagnosed father with autism spectrum disorder, major depressive disorder, with anxious features, and "other specified trauma and stressor related disorder," which Dr. Pittsenbarger explained meant, "we have some trauma symptomatology that is likely impacting our functioning. . . . but we do not have full PTSD at this point." Father was also diagnosed with cannabis use disorder due to daily cannabis use. Due to these diagnoses, father had difficulty taking ownership for his current situation and placed blame "on the system," had a "heightened level of emotionality," and an increasing frustration that "could increase the likelihood of arguments escalating to interpersonal arguments."

{¶6} Dr. Pittsenbarger recommended that father participate in a "social skills group" to help him learn "to engage with individuals," individual counseling, couples counseling, and family counseling. Dr. Pittsenbarger recommended that individual

counseling occur and be in place before starting couples and family therapy. She also recommended father attend an interpersonal partners course to help him regulate his distress tolerance and interpersonal violence. Similar to her recommendations for mother, she recommended father reduce his cannabis use and see a psychiatrist about possible psychotropic medications.

{¶7} After making her diagnoses and therapy recommendations to the parents, Dr. Pittsenbarger ended her contact with them. She explained that she is "an evaluator psychologist" and does not engage in the actual therapy sessions. She completed her evaluation of mother and last saw her on March 20, 2024. Dr. Pittsenbarger did not know whether the mother followed the recommendations or what her progress might have been. Dr. Pittsenbarger evaluated the father in March 2024 after she evaluated mother. Like the mother, she did not know whether the father followed her recommendations and what progress he might have made. She did not evaluate the children and had no information concerning their psychological evaluations.

{¶8} Given the number and types of different therapies, classes, and group sessions Dr. Pittsenbarger recommended to the parents, she expected that they would need to see at least three or four different service providers in addition to a psychiatrist to comply with her recommendations, with an ongoing reevaluation of the treatment plan every 90 days.

{¶9} S. P., a licensed foster parent, testified that she has provided foster care for the children for a year and a half since October 2023. The household consists of S.P., the two children, and several pets. S.P. testified that the boy is doing well, staying busy with day camp and day trips, and will be entering the 5th grade next school year. He did well

in school the past year, getting straight A's. There are no concerns academically or behaviorally, but he struggles socially. He receives weekly counseling for neurodivergence symptoms and has a psychiatric nurse practitioner who handles medication management for impulsivity and hyperactivity. S.P. described the support system she has built with other parents. S.P. testified that the boy was diagnosed with PTSD and will be reevaluated again for autism due to the neurodivergent traits she witnesses. The boy attends two weekly visits with the parents, one in person and one video. The boy has a good sibling relationship with his sister, but the sister has been a parental figure to him and tries to parent him. The two children generally play well together and are very attached to each other.

**{¶10}** S.P. testified that the girl is going into the 6th grade next year and had a good school year last year with no academic concerns. However, recently the girl had a really bad period of four to five weeks where she was lying, stealing, and angry all the time to the point where S.P. asked for respite. However, it appeared to be medication related and now she is doing much better on her new medication. Currently the girl has ADHD and PTSD diagnoses and is attending therapy sessions weekly. However, she is scheduled to start with a new therapist in a week and S.P. is looking for someone to begin dialectical behavior therapy and "EMDR" or "Eye Movement Desensitization" which is where "they make you move your eyes in different patterns to help activate different regions of the brain" to "help your body integrate trauma in a different way." S.P. also testified that the girl wants to try music therapy so she is looking into that for her as well.

**{¶11}** S.P. testified that the girl used to be in the OhioRISE program but was dismissed from the program. S.P. explained that the OhioRISE program requires an

assessment that has to be done "every 90 days . . . but then you also have to do like this weekly case planning, and management and all of these different things, and I couldn't. We already have like 30 appointments a month. Like I couldn't do another thing. . . ." S.P. testified that the boy is still in the OhioRISE program but the girl is not "and they both need to be in it." The girl also uses a "times unit" for body aches and pains which S.P. described as "the little electrodes that just buzz." S.P. testified that the girl had a "Keen bracelet" that "is supposed to help with body focused repetitive behaviors" but the girl lost it. S.P. also has the girl attending acupuncture with S.P.'s acupuncturist once a month to help with nervous system regulation.

{¶12} S.P. testified that the girl stopped going to visits with the parents when the children came to live with her. But then she started again when the visits were in the home. However, after one home visit the girl was upset and did not want to go back. S.P. testified that she encouraged the girl to participate in the visits with her parents "up to her comfort level."

{¶13} S.P. testified that based on her experience with both children, what they need in a home to be successful is a lot of patience, routine, mental stimulation, and stability. The parental figure also needs to be nonreactive because the children's behavior is difficult. The girl needs to be able to listen to music, to be in her room, and to receive lots of affection. The boy needs to have adequate food and sleep because he escalates rapidly when he is hungry or tired. They also need an adult that can manage all their appointments because between the two children they have 26 to 30 appointments a month. The girl has a safety plan because she has threatened suicide.

{¶14} S.P. testified that the boy wants to go back home and live with his parents. The boy was not on medication before he came to S.P., but he was struggling to regulate his behavior. Both children were referred for medication management. S.P. took them to The National Youth Advocate Program, but she was unsatisfied with the service there so she took them to Nationwide where the boy was prescribed Guanfacine for hyperactivity. The girl was on melatonin for sleep when she first arrived at S.P.'s house, but then was placed on Zoloft. She had a bad reaction to Zoloft and is in the process of weaning off Zoloft and onto Guanfacine. Personnel at National Youth Advocate Program had placed the girl on Prazosin for nightmares, but then S.P. took the girl to Nationwide and they placed her on Zoloft. The girl has expressed that she wants S.P. to adopt her and she does not want to return home to her parents. She might be willing to go home if her brother goes back home because she does not want to be separated from him. S.P. testified that the girl said she does not want to go home because her parents call her names and her father yells and screams and "they make her stand on the wall."

{¶15} S.P. testified that the boy's behavior after visits with his parents reflect that he is tired and he wants lots of hugs and reassurances. He does not talk about the visits with S.P.  S.P. testified that she would be willing to adopt the girl but the boy has expressed that he does not want to be adopted. He is willing to have S.P. be his legal guardian but when he turns 19 he wants to go back home to be with his parents. S.P. testified that she is committed to the children and would be interested in providing a permanent placement for both.

{¶16} Morgan Yoho testified that she is employed with the Agency as a visitation worker in the Family Support Unit and was assigned to this case in May 2023. From May

2023 through November 2023, the visits were together and were at the Agency. From November 2023 to February 2024, the visits were in the home. Then they had separate visits in February 2024 to April 2024. In October 2024, their visits were separated again. Then in February 2025 they had visits together.  Yoho testified that she was checking a home visit and witnessed the boy trying to manage the mother and father's relationship. In February 2024, home visits stopped because the boy witnessed a fight between the parents and the parents separated. Yoho testified that the parents would ask that their Agency visits with the children overlap so that they could have dinner together as a family. The visits separated in October 2024 because mother had gone to a domestic violence shelter.  But the visits started overlapping again in February 2025 so that they could have dinner as a family again.

{¶17} Yoho testified that the girl did not visit with her parents from January 2024 to October 2024. Then she attended consistently from October 2024 to April 2025. She has not visited her parents since her birthday in April 2025. Yoho testified that the only reason the girl gave was that "every other birthday has been bad when I was living with my parents." Yoho had some concerns about the interaction between the girl and her parents during the visits because they were discussing topics that they were not supposed to, such as why the girl wants to be adopted by the foster parent. There was also a visit where the girl became upset and was hiding under the table because there were discussions about why the girl did not want to come home. Eventually the girl came out from under the table and joined her mother and her brother who were passing a ball back and forth.  Yoho testified that the boy has occasionally missed visits because he has needed breaks from the visits. The boy's visits with his parents go well and he has not

had any complaints about his parents' behavior during the visits. Overall, the boy's visits with his parents are positive although there are times that the father has spoken in a tone that has negatively affected the boy.

**{¶18}** Yoho testified that there are virtual visits for 30 minutes on Thursday evenings, sometimes these visits are together with both parents and other times separate, depending upon whether the parents are together or separate. Yoho testified that the mother has been in domestic violence shelters on several occasions, once in October 2024 and once in April 2025. Mother now has a residence. Yoho testified that both parents have been consistent in their visits with the children. The total amount of visitation is 2 hours per week in person at the Agency and one 30 minute virtual session. Yoho testified that most recently when the visits were combined it was because the boy asked for the visits to be combined. Yoho testified that the children live with their foster parent in Columbus, Ohio and, for in person visits at the Agency, are transported down to Athens, Ohio once a week on Tuesday evenings from 5 to 7 p.m.

**{¶19}** Angel Muriay testified that she is employed with the Agency as a family services caseworker and her duties include home visits, case management, and assisting families with case plans for reunification. Muriay has been assigned to this case since October 2023. The concerns she had with the parents were their mental health and relationship issues. Father was to schedule and attend a mental health intake and follow recommendations, as well as sign releases so the Agency can collaborate with providers and receive records. Father was also not to perpetuate violence towards family members, complete a domestic violence perpetrator program, support the family financially, engage in couples counseling, and engage in the active parenting curriculum.

{¶20} Of all his case plan activities, the father has only completed the initial intake for mental health assessment, the on-line domestic violence program, and the active parenting curriculum. After father did the initial psychological evaluation, he did not follow the recommendations to engage in ongoing counseling. He initially engaged in a couple of individual counseling sessions, but not enough to refer him on to couples or family counseling. Father did complete the domestic violence program and admitted that it logically makes sense but that in the heat of the moment it is difficult to utilize the training. Father believes it is a mutual cycle and part of the blame rests with the mother.

{¶21} Muriay testified that the parents go in and out of the relationship with each other. Mother went to the domestic violence shelter in October 2024 and they separated households at that point. In September 2024, father lost his job and they were evicted. At that point they were living with friends in a car and mother was working at a hotel so they stayed there occasionally. However they lost their ability to stay at the hotel because of the domestic violence that was ongoing while they were staying at the hotel. Mother then lost her job at the hotel and decided to go to the domestic violence shelter. Father is currently living with his father and occasionally stays with mother. The two are staying connected with each other. Muriay testified that father was in several automobile accidents and has not been able to work for about nine months due to medical conditions.

{¶22} Muriay testified that mother's case plan objectives were similar to father's. Mother has actively participated in individual counseling sessions, and has established appropriate housing for the children in Hocking County, where she has relocated. Muriay testified that the biggest barrier for the children returning home is the domestic violence cycle that the parents do not seem to be able to break. The children have significant

trauma related to witnessing the fighting. The parents both report being victims of the other parent and not trusting the other parent with the children. Both parents report negative things about the other. They have accused each other of drugs, infidelity, instigating fights, and general mental instability. Mother reported that she has lost multiple jobs because father is consistently monitoring her by calling and texting – generally displaying power and control issues. Father provided Muriay with a flash drive documenting text messages between the mother and father which "further endorsed this ongoing toxicity and fighting pattern." The cycle of domestic violence has been ongoing during the two years that Muriay has been working with the family.

{¶23} Muriay testified that she does not believe the parents can safely care for the children because the children have a lot of emotional needs from the trauma they have suffered and the parents, while they do have several good qualities, will not be able to care full-time and put the attention and care towards the children that the children would need.  Muriay does not believe that the parents are able to meet the children's emotional needs because of the emotional burden it would place upon them. Muriay also does not believe that mother could care for the children's basic needs because she is currently unemployed and does not have transportation other than what is provided by Job and Family Services and Medicaid, which are difficult to navigate. Muriay testified that the mother has recently developed a history of epileptic seizures and is having some difficulty controlling them with medication.

{¶24} Muriay testified that she believes it is in the best interest of the children that permanent custody be granted to the Agency "due to the needs of the children, the timeline that they've been in care, and their need for permanency."  Muriay would foresee

the children staying with the current foster parent and, as long as it is safe and healthy, to have some ongoing contact with the parents. Muriay testified that the most recent domestic violence episode reported to her was one in January or February 2025. Muriay testified that the parents have not engaged in couples counseling and it would not be beneficial because father has not done individual counseling.

{¶25} Muriay testified that mother has engaged in individual counseling and has, for the most part, followed the recommendations, has completed the parenting class, and has adequate housing. Muriay agreed that mother has made a lot of progress. However, from the standpoint of being able to meet the children's needs, mother cannot seem to break the cycle of the relationship and protect herself and the children. Muriay testified that the girl has expressed her wishes that she wants to stay with her foster parent and does not want to visit or reunite with her parents. The boy has stated that he wishes to return to his parents. However, if he cannot return to his parents he believes his best option would be to stay with his foster parent and still visit his parents. Muriay testified that the children are very bonded with each other and it would be detrimental to separate them.

{¶26} Kayla Garcia testified that she is employed with Athens County Integrated Services as a case manager. She has been a case manager for mother for approximately one year and three months, from February 2024 until June 2025 when mother's case was transferred to Hocking County. Mother is currently a Hocking County resident. Garcia testified that she was helping mother with items on the case plan for children services. Garcia helped mother get set up with individual counseling services and housing and transportation services. Garcia was unable to get couples counseling set up because she

contacted 14 different agencies and there was nothing available. Garcia testified that transportation services are difficult to predict and may depend on case worker caseloads. Garcia testified that the mother has stayed at more than one shelter during the case. Garcia was aware that mother continued to have contact with father and continued to allow father to stay with her when she had housing. Garcia met with mother approximately seven times per month and she has witnessed positive changes in mother over that time.

{¶27} Milton Greek testified that he is also employed with Integrated Services as a counselor and has been mother's counselor for a little over a year, since May 2024. Mother attends weekly counseling sessions and has only occasionally missed a session. Greek testified that mother identified three goals she wanted to work on in the sessions: getting her children back, doing things to achieve that goal, and having the strength to do that. Greek testified mother wanted to leave the father and gain independence. In discussing the goal of reunification with her children, the central issue Greek identified was leaving the father. Mother left father at the end of September 2024 and stayed in a domestic violence shelter however she continues to have dependency on the father because she lacks a vehicle and has physical health conditions. Other than that, Greek believes that the mother has lived independently. Greek testified that the mother believes she needs to leave the father in order to be reunited with her children. Greek believes that the mother is in a significantly better mental state since she is not undergoing the stresses and strains from the father's behavior.

{¶28} When asked whether the mother has broken the cycle of abuse, Greek testified that he is aware of one incident that father was in the house and mother was very unhappy and crying, so there is still contact, "What I would say is that she wants to live

independently right now I'm not sure her health condition allows that." Greek testified that mother had several fears about leaving father such as homelessness and self-harm, but "she's remained as independent as her health allows and she has grown to the point that she now knows that she can live without the father."

{¶29} Greek testified that much of his information about mother's progress comes from mother's self-reporting. Greek testified that although the mother has set up independent housing, he was told by a fellow case worker that mother has allowed father to stay there with her and father would not leave without extensive pressure. Greek was not aware that mother self-reported that she has allowed father to stay with her in her independent living on more than one occasion. Greek was aware that mother had asked to have her visits with the children occur with father present. He has had some discussion with her about it and mother has expressed that were she given the chance to have her kids in her home, she would comply with whatever children services required her to do. Greek believes that mother struggles with independent living because her medical doctor does not want her to live alone due to seizures. Greek's understanding is that mother is not supposed to be living alone.

{¶30} Greek testified that he has discussed rebuilding relationships with her children somewhat, but they have not explored the reasons why mother's daughter does not want to visit. Greek has talked with mother about recovering her life and independence with her children, but "given the severity of her just getting independent housing, getting an income, and all of the other things that was required for her to set up a household after leaving the shelter she hasn't had much time to flush out that vision." Greek testified that he has not discussed with mother the trauma the kids have endured. He agreed that there

are still pretty big issues that remain to be addressed with counseling because mother's history with father goes back to her early childhood and mother has been victimized all her life.

**{¶31}** Greek testified that if father's behavior were to radically change then mother might be able to have some regular contact with him, but if his behavior maintains, "which is normally very common in these sorts of relationships then it would not be successful."

**{¶32}** Father testified that the family was residing in Nelsonville when the children were removed and he was working in Columbus, Ohio so he would have to leave work 30 minutes early to commute down to Athens for his scheduled visits with his children. He was able to make the trip successfully, but one or two times he was unable to make the commute timely. Father testified that the family was not evicted from their Nelsonville apartment. Instead, a month before the lease ended he lost his job in Columbus so he did not want to commit to a new lease without income. Father testified that he was recently in a car accident, broke his foot, and still has not been cleared to return to work, but is hoping to be cleared within the next month or so.  Father is currently living with his parents and currently does not drive because he did not replace the wrecked vehicle and he was told that pressing on the accelerator could reinjure his foot.

**{¶33}** Father testified that he believed that he had complied with "absolutely every piece" of the case plan except for couples counseling which could not be achieved. Father testified that he went to individual counseling, spoke to them three or four times, "and then they ended up releasing me from service telling me that they didn't feel I needed to be there." Father testified that he was told he could do worksheets in lieu of counseling, but the worksheets never materialized. Father testified that he lives with his parents rather

than the children's mother because it was his belief that the court expected them to separate in order to have the children returned to their care. Father testified that he and the children's mother do not have a romantic relationship but that they have made their best effort to continue with a platonic relationship for the benefit of the children. Father testified that he does not believe termination of his parental rights would be in the best interest of the children and that he believes some degree of familial counseling should occur. Father also believes it would be acceptable if the children were placed in mother's care because father and mother have managed several months without engaging in the interactions that caused the children to be removed from their care. Father testified that he has not been staying with mother routinely but will stay with her on Monday evenings and Thursday evenings.

{¶34} Father testified that his relationship with mother has been characterized by abuse that was not conducive to a stable environment and the children probably saw things that they should not have. Father understands that his daughter does not want to visit, but without an open line of communication with her, the father has not known how to address the daughter's concerns. Father acknowledged that his relationship with mother was "toxic" and could have been addressed through individual counseling. He agreed that he only had a handful of individual counseling sessions, but he was not aware that couples or family counseling would not occur without individual counseling being in place. Father testified that his visitation sessions have been combined with mother's sessions because the son requested it and because it facilitated transportation to the sessions.

{¶35} Natalie McPheron testified that she is a CASA volunteer assigned to the case and has been working with the family since July 2023. McPheron meets with the children every month for an hour. She receives and reads reports from Muriay, the case worker. She also has spoken with the children's school guidance counselor. She has had several phone calls with the parents but does not see them as frequently as she does the children. McPheron speaks with the children monthly about their desires. The girl wants to stay with the foster parent and does not want to reunify with the parents because she does not feel safe at home and did not feel that her parents cared for her well. The boy wants to reunite with his parents, feels that he is a good support for his family, really likes his father, and has a positive connection with him. McPheron asked the boy if he cannot be reunited with his parents, would he like living with the foster parent and he responds positively about the foster parent. However, the boy feels responsible for his parent's relationship, which is unhealthy. The boy feels he bears responsibility for the separation of his parents and wants to fix that and help them out.

{¶36} McPheron testified that the siblings have a bonded relationship and it would be detrimental for them to be separated. McPheron testified that she believes it would be in the best interest of the children to have permanent custody granted to the Agency. The predominate problem that she has seen throughout the case is the emotional relationship between the family and while the children and mother are getting individual counseling, none of them are at a stage that reunifying would not be detrimental to them. McPheron did not believe there have been sufficient opportunity or evidence of the longevity and stability of the family's relationships together. All members of the family have expressed a desire to have a relationship and the foster parent has said she would assist the children

in having an ongoing relationship with the parents and the parents are willing to work with the foster parent to allow that. McPheron believes that permanent custody with the Agency would bring the children needed stability. McPheron testified that the problem is that the case has been going on for two years and stability has only occurred within the past couple of months so there is no evidence of the longevity of it. McPheron did not believe that continued temporary custody with the Agency was a viable option because the children are struggling with the instability of the case and need direction and stability.

{¶37} The trial court issued a judgment entry granting the Agency permanent custody of the children. The court found that the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period for purposes of R.C. 2151.414(B)(1)(d). The court also found that it was in the best interest of the children to award permanent custody to the Agency.

## II. ASSIGNMENTS OF ERROR

{¶38} Father presents two assignments of error:

The Agency failed to make reasonable efforts to reunify the family prior to the termination of parental rights and the trial court erred when it found that reasonable efforts were made.

The trial court erred and abused its discretion in finding by clear and convincing evidence that it would be in the best interest of the minor children to permanently terminate the parental rights of their parents and place them in the permanent custody of the Agency.

{¶39} Mother presents one assignment of error:

The trial court erred when it granted the State's motion for permanent custody for [mother's] children, in particular, her son.

### III.  LEGAL ANALYSIS

### A.  Reasonable Reunification Efforts

**{¶40}** Father contends that the Agency failed to make reasonable efforts to reunify the family. Specifically, he argues that the Agency did not assist the father in completing his individual or family counseling requirements and did not assist him in obtaining stable and independent housing.

**{¶41}** R.C. 2151.419(A)(1) enumerates the types of hearings where the court must determine whether the Agency has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." The Agency has the burden of proving that it has made those reasonable efforts. This statute "makes no reference to a hearing on a motion for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414." *In re C.F.,* 2007-Ohio-1104, ¶ 41 (noting that the types of hearings enumerated in the statute "involve adjudicatory, emergency, detention and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state"). Instead, at various stages of the child-custody proceeding, the Agency may be required to prove that it has made reasonable efforts at family reunification. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43. Here, the permanent custody motion is governed by R.C 2151.413 and R.C. 2151.414. Therefore, the Agency was not required to show reasonable reunification efforts at the hearing

unless it had not been established previously. *Id.; Matter of I.B-C.*, 2019-Ohio-1464, ¶ 29 (4th Dist.).

**{¶42}** Our review of the record reflects that the trial court made multiple reasonable-effort findings before the Agency filed its permanent custody motion. Thus, the court did not need to again find that the Agency used reasonable efforts before it could grant the Agency permanent custody of the children. *E.g., In re C.E.,* 2025-Ohio-5641, ¶ 48 (4th Dist.). In its July 20, 2023, entry granting the Agency temporary custody the court found that the Agency "made reasonable efforts towards finalizing the permanency plan of reunification by providing visitation, substitute placement, school outreach services; and case management." In subsequent hearings in September and November 2023, March, May, June, July, October, and November 2024, and January 2025 the trial court found that the Agency made reasonable efforts towards reunification and identified specific Agency efforts in each of the subsequent orders.

**{¶43}** Because the record reflects that the trial court made reasonable-effort findings when the children were committed to the Agency's temporary custody and during multiple review stages, the Agency did not need to prove at the permanent custody hearing that it made reasonable reunification efforts. Nor did the trial court need to make such a determination. *Matter of I.B-C.* at ¶ 32. Therefore, the trial court did not err when it determined that the Agency had already established that reasonable efforts at reunification had been made prior to the permanent custody hearing and therefore such finding was not required. We overrule father's first assignment of error.

A. Permanent Custody Award

**{¶44}** Both father and mother contend that the permanent custody award was against the manifest weight of the evidence. The parents concede that the children have been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period and therefore the matter turns on whether permanent custody with the Agency is in the children's best interest.

B.  Standard of Review

**{¶45}** "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence."  *In re C.S.*, 2019-Ohio-5109, ¶ 21 (4th Dist.).  We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).
>
> In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1).  "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14.  "[I]f the children services agency presented competent and credible evidence upon which the trier of fact

reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.)  *Id.* at ¶ 21-22.

### C.  Statutory Framework and Analysis

**{¶46}**  Under R.C. 2151.414(B)(1), a juvenile court may grant permanent custody to a public children services agency if the court determines by clear and convincing evidence that (1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (e) apply, and (2) it is in the best interest of the child.  In this case, the juvenile court found that R.C. 2151.414(B)(1)(d) applied, i.e., "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *."  Because the parents do not dispute that the children were in the temporary custody of the Agency for the requisite time, we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

**{¶47}**  R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

No one factor has "greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57.

### 1. Interactions and Interrelationships of the Children

**{¶48}** The trial court noted that the girl, age 12, and the boy, age 10, have been previously subjected to a volatile, and at times physical, relationship between the parents, resulting in a chaotic and unpredictable living situation that caused significant trauma to both children. The girl has experienced significant trauma from the situation and the trial court found that she has made a voluntary choice not to visit either parent. The trial court found that the boy continues to visit with the parents and has a positive view of them.

**{¶49}** The trial court found that the children have a typical sibling relationship and are extremely bonded and intertwined. However, the girl has a history of being parentified, which is attributed to how the siblings were viewed while in the parents' household. The trial court noted the resilience that the children have shown throughout the case.

**{¶50}** Finally, the trial court found that the children are extremely bonded with the foster parent and noted that the foster parent has devoted significant time and energy into helping the children heal from their past trauma.

**{¶51}** Both father and mother argue that, while their daughter admittedly has a strained relationship with them, their son is bonded, has a positive view of them, and enjoys his visits. Additionally, the parents argue that even the foster parent testified that she believes that maintaining a relationship with the parents would be vital for the boy. They argue that this factor weighs in their favor.

### 2. Wishes of the Child

**{¶52}** The trial court found that the children expressed their wishes in a meaningful, consistent, and thoughtful manner. The girl has consistently expressed her desire not to reunify with her parents because she does not believe it would be in her best interest. The boy does want to reunify, but the trial court noted that the boy believes it is up to him to help his parents and keep the family together. The trial court found that the CASA volunteer's recommendation was that permanent custody be granted to the Agency because the children need a stable and supportive environment. The CASA volunteer was concerned with the lack of true progress made by the parents on the case plan.

**{¶53}** The father argues that the daughter's desire not to reunify was never properly addressed and the family should have had an opportunity to work through that during family counseling. However, father's argument ignores the other evidence presented that it was father's failure to engage in meaningful independent counseling that prevented the family from moving forward with family counseling.

**{¶54}** The mother argues that the CASA volunteer's testimony that the children's best interest would be served by permanent custody with the Agency ignores the fact that it would terminate the parents' rights forever and they would be dependent on the foster

parent to voluntarily maintain their relationship with the children. However, the CASA volunteer acknowledged in her testimony that even if the foster parent did not maintain the children's relationship with the parents, she would still recommend permanent custody to the Agency because she did not believe the parents were emotionally equipped to care for the children.

### 3. Custodial History

{¶55} The children were removed from the parents' custody on May 18, 2023 and were in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period. At the time the Agency filed its motion for permanent custody the children had been in the Agency's custody continuously for 19 months. Visitation is supervised and held at the Agency. Both parents concede this factor.

{¶56} The trial court found that in addition to the custodial history, the parents have failed to benefit from progress on the case plan. The children witnessed violence between the parents that has caused significant trauma. The trial court found that the parents do not appreciate the trauma and continue to use them as pawns.

### 4. Legally Secure Permanent Placement

{¶57} The Ohio Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶58}** The trial court found that a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. The trial court found an award of permanent custody to the Agency will allow the children to remain in a safe and stable environment where all their needs are met.

> The parents have had a cycle of separating and reunifying their romantic relationship. This has caused a lot of confusion to the children, but also shows the history of this unstable relationship. Ultimately, this instability falls back upon the children. The parents do not appreciate the harm they have caused or are causing these children. While the parents have reportedly ended their relationship, the Court does not believe that the parents have learned from the past trauma, or that they have benefitted from services to address the past interpersonal partner violence. The Court believes that the toxicity between the parents has not been addressed or remains.

> The children have made tremendous strides in their own personal lives while outside the care of either parent. They have started to address past trauma and still need significant time to heal. They finally have the adequate support and resources that they desperately need.

**{¶59}** Father argues that there is less of a need for a legally secure placement because the children will remain in the same foster care placement regardless. He argues that the permanent custody should be denied so that the family can begin family counseling.

**{¶60}** However, the permanent custody statutes do not contemplate leaving children in custodial limbo for an extended period of time while a parent attempts to establish that the parent can provide the child with a legally secure permanent placement. *Matter of S.S.-1*, 2018-Ohio-1349, ¶ 72 (4th Dist.), citing R.C. 2151.415(D)(4) (prohibiting court from granting "an agency more than two extensions of temporary custody" and from ordering "an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been

previously ordered pursuant to division (D) of this section"). Keeping children in limbo is not in their best interests. *In re B.C.,* 2014–Ohio–4558, ¶ 20. Thus, the trial court had no obligation to continue to hold the children in custodial limbo while the parents attempted to engage in couples or family therapy to resolve their cycle of violence. *Matter of Z.M.,* 2019-Ohio-2564, ¶ 34 (4th Dist.).

**{¶61}** Mother argues that the trial court's finding ignores the evidence that she has completed the case plan and built a safe environment for her children. She argues that the trial court's concern about her continuing relationship with father is contrary to the evidence of her caseworker and her counselor, who testified that mother's mental health has improved and she has been maintaining her independence. She also argues that father testified that they are trying to get along to allow a smooth return of custody. Mother argues that all of this weighs heavily in her favor.

**{¶62}** However, several other witnesses testified that the mother and father still have an ongoing relationship and father testified that he stays with mother two nights a week. Additionally, several witnesses testified that mother only recently began living independently and there was insufficient time to determine whether this would be consistent. The parents have previously cycled in and out of a violent relationship. The trial court determines what weight and credibility to give a witness's testimony. The trial court was in the best position to judge credibility, and we defer to its credibility determinations. *In re C.S.,* 2019-Ohio-5109, ¶ 21 (4th Dist.).

### 5. R.C. 2151.414(E)(7) to (E)(11) Factors

**{¶63}** The trial court did not identify any factors in R.C. 2151.414(E)(7) to (E)(11) and there is nothing in the parties' briefs or the record to indicate they are applicable to this case.

### 6. Totality of the Circumstances

**{¶64}** The father's failure to seek individual counseling prevented the family from moving forward with family therapy and addressing the root cause of the children's removal – the pervasive domestic violence. The mother's reluctance or refusal to sever her relationship with father earlier in the proceedings, and her decision to maintain a live-in relationship with him, even if purportedly only two of seven days of the week, supports the trial court's determination that she has not benefited from the mental health services – at least not to the extent needed to break the cycle of violence in her and her children's lives. The Agency witnesses and the CASA volunteer all testified that mother has made efforts – but the biggest issue was her inability to gain independence from father so that she can break the cycle of violence.

**{¶65}** Based on the foregoing, we conclude the trial court's best interest finding is not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the trial court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children. Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the father's second assignment of error and the mother's sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that appellants shall pay the costs equally.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
     Michael D. Hess, Judge




### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**